IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

**CURTIS A. SMITH,**

    **Plaintiff,**

v.

**ILLINOIS ASSOCIATION OF
SCHOOL BOARDS, et al.,**

    **Defendants.**                                                                   **No.: 3-10-cv-00242-DRH-CJP**

**MEMORANDUM and ORDER**

**HERNDON, Chief Judge:**

## I. Introduction

Now before the Court is plaintiff's motion in limine ("Daubert" motion) relating to exclude opinions of IASB's expert, Dr. Lars Bjork (Doc. 104). Plaintiff argues that Bjork is not qualified to render the opinions in his report, that his methodology is not scientifically valid and that his opinions will not assist the tier of fact and that they are irrelevant. Defendant opposes the motion (Doc. 113). Based on the following, the Court denies the motion.

This is an age discrimination and retaliation case against IASB and Highland Community Unit School District No. 5 brought pursuant to the Age Discrimination in Employment Act ("ADEA") and the Illinois Human Rights Act ("IHRA"). In his complaint, plaintiff alleges defendant IASB is an employment agency which was seeking applicants on behalf of defendant Highland for the position of

Superintendent. Plaintiff alleges that he contacted defendant IASB about potentially applying for that position and that Larry Dirks, an employee of defendant IASB, told him that Highland was looking for someone younger for the Superintendent position. Plaintiff claims that he nonetheless submitted an application for the Highland position to defendant IASB and that defendant IASB did not forward his name to defendant Highland. Defendant Highland eventually hired someone younger than plaintiff for the position.

## II. Standard of Law

Federal Rule of Evidence 702 and in particular *Daubert*, govern the admissibility of expert testimony. The *Daubert* standard applies to all expert testimony, whether based on scientific competence or other specialized or technical expertise. *Smith v. Ford Motor Co.*, 215 F.3d 713, 719 (7th Cir. 2000) (citing *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141 (1999)); *Tyus v. Urban Search Mgmt.,* 102 F.3d 256, 263 (7th Cir.1996) ( *Daubert*'s "framework for assessing expert testimony is applicable to social science experts, just as it applies to experts in the hard sciences."). Rule 702 provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

FED. R. EVID. 702.

*Daubert* clarified that Rule 702 charges the district court with the task of ensuring expert testimony is both relevant and reliable. *Daubert*, 509 U.S. at 589. Courts in the Seventh Circuit conduct a three-step analysis. *Ervin v. Johnson & Johnson, Inc.*, 492 F.3d 901, 904 (7th Cir. 2007).[1] First, the district court must determine whether the person whose testimony is offered is in fact an expert, as codified in Rule 702 through "knowledge, skill, experience, training or education." *Id.* (citing FED. R. EVID. 702). Notably, although "extensive academic and practical expertise" sufficiently qualify a potential witness as an expert, *Bryant v. City of Chi.*, 200 F.3d 1092, 1098 (7th Cir. 2000), "Rule 702 specifically contemplates the admission of testimony by experts whose knowledge is based on experience," *Walker v. Soo Line R.R. Co.*, 208 F.3d 581, 591 (7th Cir. 2000); see *Smith*, 215 F.3d at 718 ("[N]o one denies that an expert might draw a conclusion from a set of observations based on extensive and specialized experience.") (citing *Kumho*, 526 U.S. at 156)).

Secondly, the district court must determine whether the expert's reasoning or methodology is reliable. *Ervin,* 492 F.3d at 904; see *Mihailovich v. Laatsch*, 359 F.3d 892, 918 (7th Cir. 2004) (citing *Kumho*, 526 U.S. at 147). Specifically, the testimony must have a reliable basis in the knowledge and experience of the relevant discipline, *Kumho*, 526 U.S. at 149 (internal quotations removed), consisting in more

---

[1] The Court notes the Seventh Circuit has also described the *Daubert* analysis as a two-step process. See *Chapman v. Maytag Corp.*, 297 F.3d 682, 686 (7th Cir. 2002). However, as *Chapman* simply combines the first two steps described in *Ervin* as a single test of reliability, whether the analysis is described as a three-step or two-step process does not substantively change the Court's analysis.

than subjective belief or unsupported speculation. *Chapman*, 297 F.3d at 687; *Daubert*, 509 U.S. at 590.

Further, as to reliability, *Daubert* provided the following non-exhaustive list of relevant factors: "(1) whether the scientific theory can be or has been tested; (2) whether the theory has been subjected to peer review and publication; (3) whether the theory has been generally accepted in the scientific community." *Ervin*, 492 F.3d 901, 904 (7th Cir. 2007) (citing *Daubert*, 509 U.S. at 593-94). However, there is no requirement that courts rely on each factor, as the gatekeeping inquiry is flexible and must be "tied to the facts" of the particular case. *Kumho*, 526 U.S. at 150 (quoting *Daubert*, 509 U.S. at 591); see also *Chapman*, 297 F.3d at 687. Thus, "the role of the court is to determine whether the expert is qualified in the relevant field and to examine the methodology the expert has used in reaching his [or her] conclusions." *Smith*, 215 F.3d at 718 (citing *Kumho,* 526 U.S. at 153).

The district court possesses "great latitude in determining not only *how* to measure the reliability of the proposed expert testimony but also whether the testimony is, in fact, reliable." *United States v. Pansier*, 576 F.3d 726, 737 (7th Cir. 2009) (citing *Jenkins v. Bartlett*, 487 F.3d 482, 489 (7th Cir. 2007)). Accordingly, the court's gatekeeping function requires focus on the expert's methodology, i.e., the "[s]oundness of the factual underpinnings of the expert's analysis and the correctness of the expert's conclusions based on that analysis are factual matters to be determined by the trier of fact." *Smith*, 215 F.3d at 718 (citing *Daubert*, 509 U.S. at 595; *Walker,* 208 F.3d at 587). However, an expert must explain the methodologies

and principles that support his or her opinion; he or she cannot simply assert a "bottom line" or *ipse dixit* conclusion. *Metavante Corp. v. Emigrant Sav. Bank*, 619 F.3d 748, 761 (7th Cir. 2010) (quoting *Minix v. Canarecci*, 597 F.3d 824, 835 (7th Cir. 2010)).

Lastly, the district court must consider whether the proposed testimony will assist the trier of fact in its analysis of any issue relevant to the dispute. *See Smith*, 215 F.3d at 718; *Chapman*, 297 F.3d at 687; *Daubert*, 509 U.S. at 592. It is crucial that the expert "testify to something more than what is 'obvious to the layperson' in order to be of any particular assistance to the jury.'" *Dhillon v. Crown Controls Corp.*, 269 F.3d 865, 871 (7th Cir. 2001) (quoting *Ancho v. Pentek Corp.*, 157 F.3d 512, 519 (7th Cir. 1998)). However, the expert need not have an opinion as to the ultimate issue requiring resolution to satisfy this condition. *Smith*, 215 F.3d at 718 (citing *Walker*, 208 F.3d at 587).

Resolution of an expert's credibility or the correctness of his or her theories under the particular circumstances of a given case is a factual inquiry, left to the jury's determination after opposing counsel has cross-examined the expert at issue as to the conclusions and facts underlying his or her opinion. *Smith*, 215 F.3d at 718 (citing *Walker*, 208 F.3d at 589-90). Thus, "[i]t is not the trial court's role to decide whether an expert's opinion is correct. The trial court is limited to determining whether expert testimony is pertinent to an issue in the case and whether the methodology underlying that testimony is sound." *Smith*, 215 F.3d at 718 (citing *Kumho*, 526 U.S. at 159 (Scalia, J., concurring) (stating that the trial court's function

Case 3:10-cv-00242-DRH -SCW   Document 145   Filed 03/13/12   Page 6 of 10   Page ID #2677

under *Daubert* is to exercise its discretion "to choose among reasonable means of excluding expertise that is fausse and science that is junky.")).

### III. Analysis

As to the superintendent selection process, Dr. Bjork opined the following:

1. The Illinois Association of School Boards (IASB) conducted the Highland District No. 5 superintendent search in a professional manner, did not err in its obligation to conduct a fair and equitable search, and met the stated expectations of its client.

2. The stated characteristics for the new superintendent of the Highland District No. 5 reflected the needs of the district for an individual that could "hit the ground running." In this regard, board members commented on their experiences with previous superintendents, noting that former Superintendent Burgett was an experienced "modern" superintendent who successfully managed the district's affairs. Board members also indicate that they had a "bad" experience with Burgett's replacement, Superintendent Warner, who was a former principal in the district. They noted that he did not have hands-on experience as a sitting superintendent prior to assuming office, and observed that throughout his four-year tenure in office he was unable to manage the district in a satisfactory manner. Given the increasing complexity of issues, pressures of the job facing the new superintendent in Highland School District No. 5, and board members' experience with the retiring superintendent (Warner), it was reasonable that they would want to hire an individual with the characteristics of a "modern" superintendent.

3. The nature of superintendents' responsibilities has rapidly changed over the past several decades, and consequently the characteristics of modern superintendents are decidedly different than those of superintendents who served during previous decades. The Highland Board members expressed an interest in hiring a modern superintendent who was cognizant of contemporary issues; had recent experience in critical areas including board-based management, finance, and budgeting, and leading instructional programs; and had demonstrated capacity to handle state and federal accountability mandates, as well as an ability to work with all constituency groups, including board members and community members, all of whom may hold multiple and diverse expectations for schools.

4. Curtis A. Smith is a knowledgeable individual, but his lack of recent experience mitigated against his being recommended for the Highland School District No. 5 position. His experience as a sitting superintendent (1980-1990) was dated. The intervening years were characterized by significant changes in the context of education, the nature of superintendents, and consequently the characteristics of school district chief executive officers. His academic knowledge of school and district leadership, finance, and administration is not comparable to expert knowledge (tacit

Page 6 of 10

knowledge, practical intelligence) that is acquired through direct, hands-on experience as a superintendent. Another factor is that his tacit knowledge is from a different state at an earlier time. His experience was out-of-date (i.e. 17 years ago) and thus he would not be considered a competitive superintendent applicant in the Highland search process. In sum, his past experience as a superintendent occurred during a time when conditions were different and thus were not well suited to the demands of a modern superintendent.

     5. The Illinois Association of School Boards (IASB) acted properly in providing Highland School District No. 5 with a list of candidates - all of whom were current, "sitting" superintendents. These candidates had the characteristics that met the needs of Highland School District No. 5, conformed to board expectations and consequently distinguished themselves from Curtis Smith.

     6. Curtis Smith is a knowledgeable individual and has professional experience that allowed, and still allow, him to be a viable superintendent candidate. However, restarting his career as a superintendent would require his serving in a smaller manner, "entry level" district where he could gain day-to-day "hands-on" management experience before applying for a position in a larger school district that is more prestigious and offers a higher salary and benefits.

As to qualifications, plaintiff argues that Bjork is not qualified to render those opinions contained in paragraphs 1 and 6. First, Smith argues that Bjork cannot offer an opinion that IASB conducted a fair and equitable search because he has never been involved in a superintendent search. He also contends that this opinion cannot be based on any sort of scientific method, but rather is based on his speculation that because three people reviewing 32 applicants reached similar conclusions. Further, plaintiff contends that Bjork cannot opine that plaintiff should not have applied to Highland because Highland is a more prestigious school district with higher benefits and salary as there is no indication that he is an expert on what is comparatively more prestigious in Illinois. Again, he contends that this opinion is not based on any scientific analysis. Smith also maintains that Bjork's opinionsoverall are irrelevant, will not assist the jury and are highly prejudicial. The

Court disagrees.

Currently, Dr. Lars Bjork is a professor with and the Chair of the Department of Educational Leadership for the University of Kentucky. He holds a Ph.D. and an Ed.S. in Educational Administration; a M.P.A. in Public Administration; and a M. Ed. and B.A. in Secondary Education. In 2009, he was a Fullbright Scholar in Finland assisting with first national research of the study of superintendents. He has held various academic appointments in the education field since 1983. Throughout his career, Bjork has authored books (5), book chapters (30), book reviews (18), articles (33) peer reviewed), reports (47), ERIC documents (9), reviews of research (9), manuscripts for books (2), research papers presentations (126), and invited presentations (38) (Doc. 104-4). Peppered throughout these vast publications are many discussions, presentations and studies pertaining to the role of superintendents in a school district, their career path, recruitment, training and professional development, education, and the scope of the superintendent job and how it has changed over time. Further, he has been funded over $6 million in grant money.

Clearly, Dr. Bjork is qualified to render his opinions as to the role, development and recruitment of public school superintendents. The Court reaches this conclusion based on his extensive career, credentials in education and ample research on the topic of superintendents. Further, his methodology is reliable. He based his opinions on his experiences as the Chair of search committees at the University of Kentucky, conducting extant research on the superintendency, and co-authoring, co-editing books and refereeing journal articles on the superintendency of

schools in the United States. To arrive at his opinions, he employed methods and analysis that he has applied in his lengthy career in education that contains an emphasis on superintendency. In addition, his review of the published works regarding superintendents, albeit many are his own, and his experience in these fields qualify him to interpret the information presented to him to provide an opinion regarding the superintendent selection process.[2] Thus, Bjork's background suits him to assist the jury in its determination.

Further, as to Bjork's failure to examine the applications not "screened in" goes to the weight of his testimony not to his qualifications. As to the issue about fairness and equitable not being an issue in the case, it appears to the Court that plaintiff would like a jury instruction on this and the Court is able to do that. However, it should be noted that one could just as easily argue that this report is verification that age was a factor in the hiring decision and is an attempt to justify it and then the question becomes for the jury to decide whether the justification is adequate enough.

The Court finds that his testimony is admissible, relevant, not prejudicial and will assist the jury in making its decision in this case. While the methodology, literature and documents Bjork reviewed to make his opinions are certainly subject to scrutiny, the record does not indicate that his methodology is unreliable. To the extent that plaintiff disagrees with Bjork's conclusions, the appropriate method of

---

[2] In addition to the vast studies/publications he cited to in his report, Bjork reviewed the depositions of Highland school board members, plaintiff, and certain IASB members and several of the candidate's applications to render his opinion.

challenging such testimony is through cross-examination rather than exclusion. Thus, the Court finds that Bjork's opinions are admissible and that his opinions will assist the jury.

### IV. Conclusion

Accordingly, the Court **DENIES** plaintiff's motion in limine (Daubert motion) relating to expert opinions of IASB's expert, Dr. Lars Bjork (Doc. 104).  The Court is persuaded that IASB has carried its burden of demonstrating that Bjork has the requisite qualifications to testify as to his respective opinion.  The record is sufficient to demonstrate the relevance of evidence and plaintiff's arguments go to the weight, rather than to the admissibility, of defendant's evidence.

**IT IS SO ORDERED**.

Signed this 13th day of March, 2012.

David R. Herndon
2012.03.13
09:33:12 -05'00'

**Chief Judge**
**United States District Court**